# NATIONAL DISCOUNT COMPANY

*vs.*

# JEFFERSON D. HOOPER.

*Chattel Mortgage—Purchase With Notice.*

Where a written contract for the sale of a motor truck, executed by a salesman of the owner, expressly provided that it was subject to the approval of the owner's home office, and that title to the truck should not pass until payment therefor, and the salesman, although authorized only to make cash sales, took from the purchaser a chattel mortgage on the truck in his own name for the purchase price, one who, with notice of the terms of the contract, and of the facts that it had not been approved by the home office and the truck had not been paid for, purchased such mortgage, could not assert it as against the maker of the mortgage claiming the truck under a subsequent purchase directly from the owner.

*Decided June 21st, 1922.*

Appeal from the Circuit Court for Carroll County, In Equity (FORSYTHE, J.).

Bill by Jefferson D. Hooper against the National Discount Company. From a decree dismissing a cross-bill filed by said defendant, it appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Charles O. Clemson* and *John B. Gray,* with whom was *John B. Gray, Jr.,* on the brief, for the appellant.

*Francis Neal Parke,* with whom was *James A. C. Bond* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

The National Discount Company, the appellant, attempted to sell the motor truck of Jefferson D. Hooper, the appellee, under the power given by a chattel mortgage from Hooper to D. H. Smith, assigned by Smith to said company. On petition of appellee, alleging fraud and invalidity of title, the sale was enjoined. Appellant answered the petition for injunction and filed a cross-bill denying the fraud charged and the allegation of want of title, and asking that the court determine the balance due under the chattel mortgage and require Hooper to pay same, and that, upon his failure to pay such balance, a trustee be appointed to sell the truck. Appellee demurred to the cross-bill. The demurrer was overruled, answer filed by appellee, issues joined and testimony taken. The court below dismissed the cross-bill, and from its decree this appeal was taken.

A large volume of testimony appears in the record, much of which is in regard to collateral matters.

The issues in this case are two only, viz:

1. Did D. H. Smith, agent and salesman of the Chicago Pneumatic Tool Company, have authority to sell the truck to appellee on credit and take from him a chattel mortgage thereof in his own name?

2. If he had no such actual authority, was he placed in such position, in reference to said truck, by his employer, as to the appellee or appellants, that said employer is estopped to question the validity of the purchaser's title, or the title of appellant claiming under him through Smith?

These questions are both answered by the order signed by the purchaser and filed as Exhibit No. 1, which is as follows:

"Motor Truck Order.
"Branch, Wash. No.
"The Chicago Pneumatic Tool Company agrees to ship on or about Nov. 2 to J. D. Hooper, New Windsor, Md., R. F. D. No. 2, one Little Giant Commercial Car, Model 16, chassis only, equipped as follows:

"Body Type.... Open Flare Board.... Color of Body.... Taken in old truck at five hundred and fifty dollars; one hundred dollars deposit; one hundred dollars on delivery of truck; balance in twelve equal payments.

"This order is subject to the approval of the Home Office at Chicago, Illinois.

"Price, $2,500.00 for above, complete, including regular catalogue equipment, f. o. b. our factory. Herewith I advance $100.00 deposit on this order, balance due upon delivery, sight draft attached to bill of lading. The title to the above described property shall remain in the vendor until the purchase price is fully paid and all of the within conditions have been performed.

"It is understood and agreed in case of any claim upon the Chicago Pneumatic Tool Company for defects in material or construction, that they shall be notified of said defect and said defective part or parts returned to them within ten days of discovery of said defect, with all express or transportation charges prepaid.

"After said part of parts have been received and inspected by the Chicago Pneumatic Tool Company they agree to notify purchaser whether said part or parts are defective and to make adjustment in accordance with their Standard Warranty. This written contract is the complete agreement, and it is understood between vendor and vendee that it governs the transaction absolutely.

"J. D. Hooper,

"Signature of Purchaser."

"We hereby accept the above order and specifications and acknowledge receipt $...... deposits on the same. We agree to fulfill all the terms and conditions of this order, subject to delay resulting from fires, strikes, action of elements and other circumstances beyond our control.

"The Chicago Pneumatic Tool Company guarantees the truck in accordance with the warranty printed on back of this order.

"The Chicago Pneumatic Tool Company reserves the right to, at any time, change or modify the construction of its truck, or any parts thereof.

"D. H. Smith."

"Dated Oct. 18, 1917."

On the back of the order is a warranty which has no bearing on this case.

It will be observed that when the purchaser took this truck he did so with notice set out in the order signed by him, that: (a) "This order is subject to the approval of the home office at Chicago, Illinois. (b) The title to the above described property shall remain in the vendor until the purchase price is fully paid and all of the within conditions have been performed. (c) The entire balance of purchase money was to be paid on delivery of the truck."

In addition to the above, he had notice that the home office had not accepted the order on the form provided for that purpose at the foot of the order.

All of the above information was also in the possession of appellant at the time it accepted an assignment of this chattel mortgage and the notes thereby secured, its own testimony showing that in all cases where it purchased such securities it required the sales order to be filed with it, and that this was done in the present instance.

It is established by testimony, entirely satisfactory to us, that Smith's authority to sell trucks was limited to cash sales, except where credit sales were in particular cases expressly authorized; and that there was no such authorization in this case.

Smith worked on a salary and commissions. His method of operation seems to have been substantially as follows:

He entered into an arrangement with appellant by which it agreed to purchase from him notes and chattel mortgages

which it might approve. When a purchaser was unable to pay cash, he took from him notes to himself secured by chattel mortgage, and offered these, accompanied by the sales order in the form shown by Exhibit 1, to appellant. If it accepted the offer, Smith received from appellant, immediately, enough cash to enable him to settle with his employer, and so he was able for some time to do business without the knowledge of the home office that he was undertaking to sell the trucks on credit.

For some reason, in the attempted sale to Hooper, the order sent in to the Pittsburgh branch of the company, under which Smith was employed, was not in the name of Hooper as purchaser, but the Maryland Motor Car Company was named as purchaser, and it was turned in as a cash sale. While Burns, the manager of the Pittsburgh office, was waiting to receive the cash from this deal, a Mr. Armstrong, from appellant's office, went to Pittsburgh and looked up Burns, with a view to checking up Smith's transactions with appellant. It appears that then for the first time Burns, or his company, heard of Hooper as the purchaser of the truck in question. Just before the attempted sale to Hooper, Smith had sold to appellant certain fictitious notes secured by a chattel mortgage executed by a young man about town of no substance, named Anderson, purporting to be in settlement for a truck which was never sold or delivered to Anderson, and which was never intended to be, either by Smith or Anderson. Smith paid two of these notes. About the time others were maturing and not being paid, Smith came along with the Hooper notes. On accepting them, instead of paying Smith the proceeds, as had been its custom theretofore, appellant credited Smith's account with said proceeds and charged him with the Anderson notes, so Smith got no cash and was therefore unable to settle with his company for the alleged Hooper deal, disguised as, and then known to Burns as, a cash sale to the Maryland Motor Car Company.

After the investigation which followed, Smith was discharged by his company. Previous to this interview between Armstrong and Burns, there had been no intercourse of any kind betwen appellant and the Chicago company.

Burns testifies that the order, filed in this case as "Exhibit 1," never passed through his office, although Smith says he mailed him a copy of it. According to Burns, the order covering the truck in question was turned in under the name of the Maryland Motor Car Company.

"Q. How was it turned in? A. As a cash sale. Q. To whom? A. The Maryland Motor Company. Q. Was that money ever forwarded to you or paid to the Chicago Pneumatic Tool Company? A. No. The money not coming in in the regular way, we began an investigation. Just about the time we began this investigation was about the time Mr. Armstrong called on me and told me about his trouble with Smith. Q. What did he tell you? A. He told me some of Smith's deals were evidently in need of checking up. First he came in and introduced himself as being from the National Discount Company of Cleveland. I said, 'Is that the firm that Smith is dealing with?' He said, 'Yes.' * * * He also brought out several deals that Smith had made, and his cards with him. He asked me to check with him the car numbers that had been delivered to Smith and had been paid for. He had every sale except one, John Anderson. He found we had no such truck number and had never built a truck or had a truck in stock that had the same number as the one of John Anderson, and they figured Smith had done something or other that it is best I should not discuss here as I have no proof he did it. * * * Q. When did the title to these trucks pass from the Chicago Pneumatic Tool Company to the purchaser? A. The title passed, in the case of a cash sale, when the money was paid and the car was delivered, in the case of a time sale it passed when the last dollar was paid, which was after the last note was paid. Q. Did you or your branch

whether at Pittsburgh or Washington, or did you or any of your subordinates, or did Mr. Smith at any time, have title to the trucks of the Chicago Pneumatic Tool Company which you or he had for sale? A. Positively no. * * * Q. While Mr. Smith was doing business for your company at Washington and reporting to you the sales made, will you state whether or not these sales were reported as cash transactions or credit transactions? A. Yes, sir, they were reported as cash transactions. * * * Q. Will you state whether or not Mr. Smith was ever charged by the Chicago Pneumatic Tool Company with the price of any of these trucks? A. He positively was not. * * * Q. Did you at any time prior to the visit of Mr. Armstrong to your office in Pittsburgh ever know of the character of the transaction between Mr. Smith and the National Discount Company? A. I never knew the National Discount Company, never heard their name mentioned until Mr. Armstrong came in, but Mr. Smith told me he was dealing with a finance company at Cleveland and that he had formerly dealt with an individual at New Castle. I asked him how he could do that without passing title. He said he had a contract. I could never understand how a firm would do business with a man who had no authority to pass title. Q. How did he say he was passing title? A. I never questioned him about that. I never saw his form until later on. * * * Q. When did Mr. Smith leave the employ of the Chicago Tool Company? A. I don't recall the exact date, but in connection with his leaving he practically was through after Mr. Armstrong's visit. First after calling him at Washington and couldn't get him I called him on the long distance telephone and got him at Norfolk. I told him to come in immediately and straighten out these matters. A few days later he came in. I don't recall who it was, whether it was Mr. Bowman or Mr. Smith who asked me to meet Mr. Bowman, asked me to meet them at the Ft. Pitt Hotel in Pittsburgh. Mr. Bowman represented the National Discount Company, he asked me if I would arrange for the

Chicago Pneumatic Tool Company to pass to them the title for all the trucks for which they had notes. I told him I wouldn't arrange any such thing; that we had no dealings with the National Discount Company and didn't know them and anything they had to do of that sort was between themselves and Smith. I think that was about two weeks after Mr. Armstrong's visit."

It seems hardly worth while to quote further testimony. What we have quoted is without substantial contradiction, except that Smith testifies Burns knew he was taking chattel mortgages and encouraged him in doing it, because it enabled him to make more sales. Smith's testimony is far from convincing both inherently, and by reason of the character of the witness, as revealed by his own and other testimony in the case. Burns admits he knew Smith was taking notes and suspected he was taking mortgages, but did not know it. Burns also testifies he told two of the officers of the company from the home office that Smith was taking notes. This, however, was no concern of the company's, if Smith was willing to carry notes of customers in his own name and make cash settlements with the company. There is no evidence that the home office ever heard that Smith was taking chattel mortgages, and even if it had, such knowledge would not be controlling in the circumstances disclosed by this record.

Appellant endeavors to bring this case within the doctrine that where one of two innocent persons must suffer from the wrongdoing of another, that one should be made to suffer who made it possible for the wrongdoer to inflict the injury. And in this connection he offers evidence of several transactions where credit sales made by other salesmen were financed by Smith, with the knowledge, or at the suggestion, of Burns, in much the same way as was done in the case at bar.

That doctrine is not applicable here. The most that can be said in reference to these cases, from appellant's standpoint, is that there were two or three instances in which Burns permitted Smith to sell on credit and, possibly, to take chattel

mortgages. In all of them, however, Smith made cash settlements with the company and the company had no further interest in the matter. But, aside from that, either Burns had, or he had not, power to bind the company in such a transaction. If he had such power, then his assent was simply the exercise by the company of its discretion to permit credit sales, which it is not denied could be made with the express approval of the company. If he had not such power, then his assent signifies nothing so far as the company is concerned. We are relieved, however, from the necessity of deciding what effect, if any, the conduct of Burns in these matters would have as to purchasers without notice of the limitations upon Smith's actual authority. For here we have direct and explicit notice to appellant that any title it might take would be subject to the reserved title in Smith's employer until the truck should be paid for. However many times the owner of the trucks might have waived conditions of written contracts with others, it gave no right to appellant to assume it had done so in this case, in face of the express written reservation of title, and the express requirement of approval by the home office, which plainly had not been obtained, and without making the slightest effort to ascertain by inquiry the real conditions, when it had easy access to the home office; and no title having been passed to appellee from Smith, appellee could convey none to him, nor could appellant derive title by assignment from Smith, especially as both the notes and chattel mortgage were taken by appellant with notice.

When appellee was informed of the fraudulent conduct of Smith, he purchased the truck direct from the owner and thus acquired unencumbered title thereto.

It follows that appellant had no lien on the truck, and that its cross-bill was properly dismissed.

*Decree affirmed, with costs to appellee.*